UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| RUDY DICKERSON, § § Plaintiff, § § v. § § RICHARD WHEELEN and TIMOTHY § BATES, § § Defendants. § § | Civil Action No. 6:19-CV-00084 |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rudy Dickerson brings a civil rights complaint under 42 U.S.C. § 1983, alleging that two detention officers used excessive force while placing him in a restraint at the Victoria County Jail. (Dkt. No. 1). Dickerson, proceeding *pro se* and *in forma pauperis*, has provided a More Definite Statement of his claims. (Dkt. No. 15). Victoria County has provided a report with administrative records under *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1987) (a "*Martinez* Report"). (Dkt. No. 20); (Dkt. No. 21). The Defendants, Sergeant Richard Wheelen and Lieutenant Timothy Bates, have filed a Motion for Summary Judgment, (Dkt. No. 63), and Dickerson has filed a Cross-Motion for Summary Judgment, (Dkt. No. 69), to which the Defendants have filed a Response. (Dkt. No. 70).

The Court **TERMINATES** the referral of these motions to Magistrate Judge Julie K. Hampton. For the reasons discussed below, the Court **GRANTS** the Defendants'

Motion for Summary Judgment, (Dkt. No. 63) and **DENIES** the Motion for Summary Judgment filed by Dickerson. (Dkt. No. 69).

I.  BACKGROUND AND PROCEDURAL HISTORY

While confined at the Victoria County Jail in September 2019, Dickerson filed this civil rights action under 42 U.S.C. § 1983 against the Victoria County Sheriff's Office, Sheriff Thomas Michael O'Connor, Sergeant Wheelen, and Lieutenant Bates. (Dkt. No. 1 at 1, 4-5). Dickerson alleges that Sergeant Wheelen and Lieutenant Bates used excessive force when they placed him in "a restraint wrap" at the Jail, resulting in a knee injury. (*Id.* at 5). He seeks compensatory damages for his pain and suffering. (*Id.*).

This case was previously assigned to U.S. District Judge Kenneth M. Hoyt.[1] Judge Hoyt screened Dickerson's complaint as required by the Prison Litigation Reform Act (the "PLRA"), 28 U.S.C. § 1915A, and summarily dismissed the claims against the Victoria County Sheriff's Office for lack of capacity and the claims against Sheriff O'Connor for lack of personal involvement or other basis for supervisory liability. (Dkt. No. 9). Judge Hoyt entered a separate order directing Dickerson to provide a more definite statement of his claims against Wheelen and Bates. (Dkt. No. 14).

Dickerson filed a More Definite Statement, (Dkt. No. 15), alleging that Wheelen and Bates used excessive force against him at the Victoria County Jail on July 5, 2019, while placing him in a restraint that had straps that wrapped around his legs. (*Id.* at 1, 3). According to Dickerson, the officers placed him in the restraint because he did not

---

[1] This case was later transferred to the undersigned under Special Order No. V-2020-6. (Dkt. No. 17).

answer intake questions during the booking process. (*Id*. at 3). He alleges that the officers wrapped him too tightly with his knees together. (*Id*.). He contends that one of the officers—and he admits that he does not know which one—"pulled a strap as tight as [he] could," injuring Dickerson's right knee. (*Id*. at 5). Dickerson claims that his right knee was fractured in two places as a result of the force used to secure his legs in the restraint. (*Id*. at 4).

After Dickerson filed his more definite statement, Judge Hoyt ordered Victoria County to further supplement the pleadings with a *Martinez* Report. (Dkt. No. 16). The *Martinez* Report, which includes records and a video of the incident, shows that the use of force occurred during the intake process at the Victoria County Jail, following Dickerson's arrest during the early morning hours of July 5, 2019, on charges of burglary of a habitation with intent to commit assault. (Dkt. No. 20 at 3); (Dkt. No. 21); (Dkt. No. 22 at 3–4, 22). These records show that detention officers at the Jail placed Dickerson in the restraint as a precautionary measure after he frustrated their efforts by sitting down on the floor and repeatedly refusing to answer booking questions posed by the officers. (Dkt. No. 21); (Dkt. No. 22 at 99–124).

The Court authorized service of process on Sergeant Wheelen and Lieutenant Bates, (Dkt. No. 29), who have now filed a Motion for Summary Judgment based on the defense of qualified immunity. (Dkt. No. 63). They argue that Dickerson cannot show that their actions were unreasonable or excessive for purposes of demonstrating a constitutional violation. (*Id*. at 9–15). In support, they point to affidavits from all the officers involved in the use of force and the video of the incident, which show that

minimal force was used to secure Dickerson with the restraint and that it was applied after he repeatedly refused to cooperate during the intake process. (*Id.*). They also point to medical records showing that Dickerson reported an injury to his right knee, but that an examination at a local orthopedic hospital showed no evidence of any fracture, dislocation, or injury other than soreness. (Dkt. No. 64 at 3). Dickerson has filed a Cross-Motion for Summary Judgment in response, arguing that he was not required to answer the officers' questions and that the Defendants violated his rights by restraining him against his will. (Dkt. No. 69).[2]

## II. LEGAL STANDARDS

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure, which provides that a reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* "In making that determination, a

---

[2] On March 2, 2020, Dickerson submitted a one-page letter asking the Clerk's Office to enter summary judgment on his behalf. (Dkt. No. 55). This letter, which included no argument, evidence, or authority, was construed as a motion. The letter motion, (Dkt. No. 55), was terminated because it was superseded by the more recent summary judgment motion filed by Dickerson. (Dkt. No. 69).

4

court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014) (per curiam) (internal quotations omitted).

If the movant demonstrates the absence of a genuine issue of material fact, the burden ordinarily shifts to the non-movant to provide specific facts showing the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (emphasis omitted). However, a "good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (internal quotations omitted). "Qualified immunity is a complete defense, and [a defendant is] entitled to summary judgment on the basis of qualified immunity unless [the plaintiff] can show triable issues as to whether [the defendant] violated a clearly established right of which a reasonable officer would have been aware." *Brewer v. Hayne*, 860 F.3d 819, 824 (5th Cir. 2017). When a defendant pleads qualified immunity, the plaintiff "must rebut the defense by establishing a genuine fact dispute as to whether the official's allegedly wrongful conduct violated clearly established law." *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (alteration omitted). A plaintiff cannot satisfy this burden with conclusory allegations based on speculation or unsubstantiated assertions of wrongdoing. *See Mitchell v. Mills*, 895 F.3d 365, 370 (5th Cir. 2018). In addition, courts are not obliged to accept a party's version of events where it is blatantly contradicted by video evidence. In addition, courts need not accept a party's

5

version of events where it is blatantly contradicted by video evidence. *Buehler v. Dear*, ____ F.4th ____, ____, 2022 WL 619584, at *3 (5th Cir. 2022).

Because Dickerson represents himself, his pleadings are entitled to a liberal construction, meaning they are subject to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972) (per curiam). Even under this lenient standard, *pro se* litigants are expected to "properly plead sufficient facts that, when liberally construed, state a plausible claim to relief, serve defendants, obey discovery orders, present summary judgment evidence, file a notice of appeal, and brief arguments on appeal." *E.E.O.C. v. Simbaki, Ltd.*, 767 F.3d 475, 484 (5th Cir. 2014). Courts are not required "to scour the record in search of evidence to defeat a motion for summary judgment; [courts] rely on the nonmoving party to identify with reasonable particularity the evidence upon which he relies." *Buehler v. City of Austin/Austin Police Dept.*, 824 F.3d 548, 555 n.7 (5th Cir. 2016) (internal quotations omitted).

### III. DISCUSSION

#### A. QUALIFIED IMMUNITY

The Defendants have invoked the defense of qualified immunity, which protects government officials from personal liability for monetary damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity, which is designed to give public servants "breathing room to make reasonable but mistaken judgments," "protects all but

the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132 S.Ct. 1235, 1244, 182 L.Ed.2d 47 (2012) (internal quotations omitted). Qualified immunity shields public officials from claims for monetary damages unless a plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (citing *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738). Courts have discretion to decide the order in which to consider the two-prong inquiry when determining whether qualified immunity is warranted. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009). For reasons discussed below, the Court concludes that the officers in this case are entitled to qualified immunity under the first prong of the inquiry because Dickerson does not demonstrate that they used excessive force against him in violation of his constitutional rights.

  **B.**  **CLAIMS OF EXCESSIVE FORCE IN THE BOOKING CONTEXT**

  Dickerson alleges that Sergeant Wheelen and Lieutenant Bates used excessive force against him as he was being booked into the Victoria County Jail following his arrest by local police. To the extent that the use of force occurred while Dickerson was still in custody of the arresting officers, but before he was booked into the Jail, his claim is governed by the legal standard that applies to arrestees under the Fourth Amendment. *See Gutierrez v. City of San Antonio*, 139 F.3d 441, 452 (5th Cir. 1998) (concluding that the Fourth Amendment applied to incidents occurring while the individual was still in custody of the arresting officer, but that the Fourteenth Amendment applied after he was

7

processed by the police department and booked into Jail); *see also Surratt v. McClaran*, 234 F. Supp. 3d 815, 823–24 (E.D. Tex. 2016) (applying the Fourth Amendment standard where the plaintiff had not been released from the arresting officer's custody or transferred to a jail cell).

To prevail on an excessive-force claim under the Fourth Amendment, a plaintiff must show that he suffered (1) "an injury" that (2) resulted "directly and only from" an officer's use of force that was "clearly excessive" and (3) "objectively unreasonable." *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022) (internal quotations omitted). The Supreme Court has outlined the following considerations that inform the need for force in the Fourth Amendment context:

1) the severity of the crime committed;

2) whether the suspect posed an immediate threat to the safety of officers or others; and

3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

*Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).

The Fourth Amendment inquiry is an objective one that is determined "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*; *see also Lombardo v. City of St. Louis*, ____ U.S. ____, ____, 141 S.Ct. 2239, 2241, 210 L.Ed.2d 609 (2021) (per curiam). This "calculus of reasonableness" must include "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97,

109 S.Ct. at 1872; *see also Plumhoff v. Rickard*, 572 U.S. 765, 775, 134 S.Ct. 2012, 2020, 188 L.Ed.2d 1056 (2014) (same).  Dickerson fails to establish that the Defendants used force against him unreasonably or excessively in violation of his constitutional rights.

### 1.     Dickerson Did Not Suffer an Actionable Injury

The Defendants argue that Dickerson cannot prevail on his excessive force claim because there is no evidence that he suffered more than a *de minimis* injury as a result of being placed in the restraint. (Dkt. No. 63 at 13–15). "In evaluating excessive force claims, courts may look to the seriousness of injury to determine whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction as is tantamount to a knowing willingness that it occur." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam) (internal quotations omitted).  Thus, "the extent of the injury inflicted may be considered in determining whether the officers used excessive force." *Id.* (cleaned up).  Although a plaintiff need not demonstrate a "significant injury," injuries such as bruises, abrasions, or contusions are considered *de minimis* and are insufficient to demonstrate that excessive force was used.  *See Westfall v. Luna*, 903 F.3d 534, 549–50 (5th Cir 2018) (per curiam); *Brooks v. City of W. Point*, 639 F. App'x 986, 990 (5th Cir. 2016) (collecting cases).

Although Dickerson alleges that his right knee was fractured in two places from being placed in the restraint, (Dkt. No. 15), medical records of an examination at Victoria Orthopedic Center less than a week after the use of force refute that claim.  The specialist who examined Dickerson on that occasion observed that his knee ligaments were stable and that X-rays disclosed no fractures or dislocations. (Dkt. No. 64 at 3).  No other injury

9

was noted. (*Id*.). Because Dickerson had "medial joint line tenderness upon palpation," he was given a knee brace and asked to return for "a possible steroid injection" and an MRI in six weeks to rule out a "meniscal tear." (*Id*.). Dickerson did not return for a follow up appointment and he presents no other medical records showing that he required any further care.

Dickerson has not offered any evidence to refute the medical records, which show that he suffered nothing more than tenderness or soreness that did not require treatment. The insignificant nature of the injury is consistent with the rest of the summary judgment record, which shows that Dickerson was placed in the restraint with minimal force and voiced no complaints of pain. Minor, incidental injuries that occur in connection with the use of restraints typically do not give rise to a constitutional violation. *See, e.g.*, *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (holding that "handcuffing too tightly, without more, does not amount to excessive force"). Because the evidence does not establish that Dickerson suffered more than mere soreness, he cannot prevail on a claim that excessive force was used when officers placed him in the restraint.[3] *See Westfall*, 903 F.3d at 549–50. Even assuming that his injury could be considered significant enough for

---

[3] Absent a physical injury, a prisoner's claim for monetary damages is barred by the PLRA, 42 U.S.C. § 1997e(e), which states as follows:
> No Federal civil action may be brought by a prisoner confined to a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18).

*See also Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005) (per curiam) (holding that allegations of "mental anguish, emotional distress, psychological harm, and insomnia" are barred by 42 U.S.C. § 1997e(e)).

purposes of making a claim under the Fourth Amendment, none of the other factors identified by the Supreme Court weigh in favor of finding that force was used unreasonably or that a constitutional violation occurred.

### 2. Force Was Not Used Unreasonably

The Defendants have presented evidence showing that officers placed Dickerson in a restraint wrap, which was objectively reasonable under the circumstances after he resisted efforts to obtain information during the booking process and repeatedly refused to cooperate or answer intake questions following his arrest for a violent offense. *See Graham*, 490 U.S. at 396, 109 S.Ct. at 1872. The evidence shows that Dickerson had been arrested for burglary of a habitation with intent to commit an assault. (Dkt. No. 22 at 22). The victim reported that Dickerson and another assailant named Logan Smith broke down the front door to his home using cinder blocks. (*Id.*). The offense took place in the middle of the night at around 3:00 a.m. on July 5, 2019. (*Id.*). Dickerson and Smith entered the victim's home with intent to assault him for allegedly having relations with Smith's girlfriend. (*Id.*). The victim called the police after informing the intruders that he had a gun, but they refused to leave.[4] (*Id.*).

Although this case does not concern force used during an arrest in the traditional sense because it occurred inside a jail and not on the street, the Defendants provide

---

[4] Dickerson remained in custody at the Victoria County Jail until he was convicted of the charges against him on January 13, 2020. (Dkt. No. 22 at 3–5). Because Dickerson had a lengthy record of previous offenses, he was kept in "maximum" custody until he was transferred to the Texas Department of Criminal Justice ("TDCJ") on February 18, 2020 to serve a five-year prison sentence. (*Id*. at 3, 25–46).

evidence showing that a reasonable officer could have concluded that Dickerson posed a potential threat to himself and others. The evidence also shows that Dickerson resisted officers by refusing to cooperate during the booking process and not responding to a mandatory intake questionnaire to determine whether he was a threat to himself or others. Sergeant Wheelen provided an affidavit, explaining that he was the shift supervisor at the Victoria County Jail on July 5, 2019, when a detention officer, Nicolas Ruiz, called for help after Dickerson refused to comply with orders to turn and face the wall in the intake area. (Dkt. No. 63-4 at 3). Sergeant Wheelen responded along with several other jailers, including Officer Dodds, Deputy Penney, Deputy Walters, Corporal Hinojosa, and Corporal Gonzales, (*id.*), each of whom supplied affidavits that support Sergeant Wheelen's account. (Dkt. No. 63-4); (Dkt. No. 63-6); (Dkt. No. 63-7); (Dkt. No. 63-8); (Dkt. No. 63-9); (Dkt. No. 63-10).

When Sergeant Wheelen and the other officers responded to Officer Ruiz's call for help, Dickerson was sitting on the floor in the intake area next to the elevators, refusing to cooperate. (Dkt. No. 63-4 at 3); (Dkt. No. 63-6 at 3). Wheelen directed two officers (Officer Dodds and Deputy Penney) to help Dickerson to his feet. (Dkt. No. 63-4 at 3). Once standing, Dickerson refused to answer any of the intake questions. (*Id.*); (Dkt. No. 63-7 at 3). Sergeant Wheelen left briefly and returned with an "intake medical questionnaire" and attempted to ask Dickerson "the standardized questions." (Dkt. No. 63-4 at 3). Wheelen explains that detention officers are required by the Texas Commission on Jail Standards to ask certain questions to evaluate an arrestee's mental health for purposes of determining whether he is "potentially suicidal or suffering from a mental

12

health issue that requires attention." (*Id*.). Dickerson refused to provide any response, stating that he was "not talking." (*Id*.). Because Dickerson had refused to comply with multiple orders by the officers, Wheelen concluded that he had "no choice but to order his placement in the Wrap for his own safety and the safety of everyone else in the jail at that time." (*Id*.).

According to the Defendants, the restraint known as "the Wrap," which is made by Safe Restraints, Inc., is an apparatus that was developed by law enforcement and medical professionals and has been "saving lives, reducing injuries, and minimizing risks for all involved" for over two decades. (Dkt. No. 63 at 3 n.1). Two officers (Corporals Hinojosa and Gonzales) retrieved the Wrap and laid it on the floor. (Dkt. No. 63-4 at 3). After Dickerson willingly kneeled onto the wrap, two other officers (Deputy Penney and Officer Dodds) "assisted [him] into the lying position," where his ankles were crossed and secured with a Velcro strap. (*Id*.). Hinojosa, Gonzales, and Dodds "then helped secure the leg portion of the Wrap" around Dickerson's lower extremities with straps to immobilize his legs. (*Id.* at 3–4). Sergeant Wheelen observed that Dodds tightened the straps on the leg portion of the Wrap to ensure that there was "little to no slack," but "not so tight as to apply excessive pressure to Dickerson's legs." (*Id.* at 4). Dickerson remained in the prone position as Sergeant Wheelen placed "the upper portion" of the Wrap over his upper body. (*Id*.). As Dickerson was rolled onto his side and placed in a seated position, Deputy Penney buckled the upper portion of the Wrap to the lower portion, which Sergeant Wheelen secured together. (*Id*.) Wheelen and Penney then placed Dickerson onto "the Wrap transport cart." (*Id*.); (Dkt. No. 63-8 at 3). Another officer

(Officer Threadgill) wheeled Dickerson down the hall near the "scanner node" where he could be monitored by video with scans every 15 minutes for his safety. (Dkt. No. 63-6 at 3).

The Defendants provide surveillance video of the intake area on the morning of July 5, 2019, which captured the entire incident and supports the officers' accounts. (Dkt. No. 21). The video, which is nearly nine minutes long, shows Dickerson exit the elevator then abruptly sit down on the floor while officers were attempting to escort him to the intake area of the Jail. (*Id.*, Video at 0:32). Several other officers arrived and attempted to reason with Dickerson, who was helped to his feet by two of the officers and placed against the wall with minimal, if any, force. (*Id.*, Video 0:32–1:28). The video shows officers questioning Dickerson with no success while one officer in particular, presumably Sergeant Wheelen, attempted to get Dickerson to answer questions by reading from a form on a clipboard. (*Id.*, Video 2:09–3:25). When Dickerson refused to comply, officers brought out the Wrap and placed it in front of Dickerson. (*Id.*, Video 3:25–5:24). The Wrap, which was rolled out on the floor, looks like a blanket with straps attached to it. (*Id.*). The video shows that Dickerson willingly knelt onto the Wrap before being lowered into the prone position by officers, who then rolled Dickerson over so that the Wrap could be secured around his legs with the straps. (*Id.*, Video at 5:45–7:15). After the straps were tightened and a separate apparatus was used to secure Dickerson's upper torso, officers lifted him onto a cart and transferred him from the hallway into the intake area of the Jail. (*Id.*, Video 7:15–8:47).

The Defendants provided several photographs of the transport cart that was used to move Dickerson after he was secured with the restraint. (Dkt. No. 63-2); (Dkt. No. 63-8 at 3). All the officers who were present have provided affidavits, stating that use of the restraint was necessary because Dickerson's refusal to answer the intake medical questionnaire prevented them from obtaining information about his mental health status so that they could determine whether he presented a danger of harm to himself or others. (Dkt. No. 63-4 at 3); (Dkt. No. 63-6 at 4); (Dkt. No. 63-7 at 3); (Dkt. No. 63-8 at 3); (Dkt. No. 63-9 at 4); (Dkt. No. 63-10 at 3). According to Sergeant Wheelen and the other officers who participated in applying the Wrap, Dickerson did not complain of or show signs of pain or discomfort at any time. (Dkt. No. 63-4 at 4); (Dkt. No. 63-6 at 4); (Dkt. No. 63-7 at 3); (Dkt. No. 63-8 at 3); (Dkt. No. 63-9 at 4); (Dkt. No. 63-10 at 3). The video supports the Defendants' claim that Dickerson showed no signs of pain and made no complaints while being placed in the Wrap. (Dkt. No. 21, Video at 5:45–8:47).

As an initial matter, the Defendants note that there is no evidence showing that Lieutenant Bates was present for the use of force that occurred on July 5, 2019. (Dkt. No. 63 at 8–9). Bates provided an affidavit, stating that his only encounter with Dickerson occurred on July 25, 2019, when he and another deputy interviewed Dickerson about the grievance Dickerson filed. (Dkt. No. 63-5 at 2–3). Bates had no other involvement with Dickerson or the incident that occurred on July 5, 2019. (*Id.*). Dickerson does not dispute this evidence. Because personal involvement is an essential element of a civil rights cause of action in an individual capacity claim, *see Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir.

15

1992), Bates is entitled to qualified immunity and summary judgment on the claims against him.

The Defendants further argue that there is no evidence showing that force was unreasonably applied by any of the other officers under the circumstances, given Dickerson's resistance and repeated refusal to comply with booking questions regarding his mental health following his arrest for a violent offense. (Dkt. No. 63 at 15). Every officer who participated emphasized that the restraint was necessary because Dickerson refused to obey repeated orders or provide answers to standard intake questions required by the Texas Commission on Jail Standards, which are designed to assess a detainee's risk for suicide and other mental health needs. (Dkt. No. 63-4 at 4); (Dkt. No. 63-6 at 4); (Dkt. No. 63-7 at 3); (Dkt. No. 63-8 at 3); (Dkt. No. 63-9 at 4); (Dkt. No. 63-10 at 3). As the Defendants correctly note, force is authorized even in circumstances involving passive resistance when one refuses to comply with an officer's orders and instructions. (Dkt. No. 63 at 16–20). In that respect, the Fifth Circuit has acknowledged that officers may consider a suspect's refusal to comply with instructions in assessing whether physical force is needed to effectuate his compliance. *See Deville*, 567 F.3d at 167. Faced with an uncooperative arrestee, officers can use measured and ascending actions that correspond to an arrestee's escalating verbal and physical resistance. *Betts*, 22 F.4th at 582.

Dickerson does not dispute that he was arrested for a violent offense during the early morning hours of July 5, 2019, when he was apprehended and transported to the Victoria County Jail. Likewise, Dickerson does not dispute that he resisted officers during the booking process by frustrating their efforts to escort him and by refusing to

cooperate or answer the mental health intake questionnaire that is required by the Texas Commission on Jail Standards. The video, which captures Dickerson's repeated refusal to cooperate or comply with commands, confirms that officers attempted to reason with him for several minutes and that they did not immediately resort to force by applying the restraint "without attempting to use physical skill, negotiation, or even commands." *Betts*, 22 F.4th at 583 (citation omitted). Under these circumstances, the officers used force reasonably and did so in a manner that was not excessive to the need for gaining Dickerson's compliance with booking procedures that were required to ensure the safety of Jail detainees.

### 3. Dickerson Does Not Raise a Fact Issue

Although Dickerson does not dispute that he resisted officers at the Jail by refusing to answer the intake questions, he appears to argue that force was used in violation of his constitutional rights because he was not required to cooperate. (Dkt. No. 69 at 1). Dickerson explains that he was not required to answer any of the officers' questions once he invoked his *Miranda* rights. (*Id.* at 1–2). Assuming that Dickerson had been given his *Miranda* warnings before he arrived at the Jail, the Supreme Court has decided that the right to remain silent does not extend to "routine booking questions." *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S.Ct. 2638, 2650, 110 L.Ed.2d 528 (1990) (recognizing a "routine booking question exception" that "exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services" (internal quotations omitted)); *Presley v. City of Benbrook*, 4 F.3d 405, 408 n.2 (5th Cir. 1993) ("In the wake of *Muniz*, it has been universally accepted by courts, both federal and state,

17

that a routine booking question exception to the Fifth Amendment exists."). Thus, Dickerson does not establish that officers had no right to ask him whether he was suicidal during the booking process.

Dickerson also appears to claim that officers should not have restrained him for any reason because he is an "MHMR patient" with mental-health issues. (Dkt. No. 69 at 1). Dickerson provides no support for this claim, which is made in his unsworn motion for summary judgment and is not competent evidence. *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010) ("When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings."); *Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991) ("Unsworn pleadings, memoranda, or the like are not, of course, competent summary judgment evidence.")).

The risk of suicide and the State's responsibility to prevent self-inflicted harm by detainees is well recognized by the Fifth Circuit. *See, e.g.*, *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996) (en banc) (noting that "the State's obligation to prevent suicide may implicate a kaleidoscope of related duties, including a duty to provide not only medical care, but also protection from self-inflicted harm"). Taking Dickerson at his word that he was suffering from a mental illness, he cannot fault the officers for placing him in the restraint for precautionary reasons after he refused to answer any intake questions about his mental health. *See Kelley v. Hamilton*, No. A-11-CA-246-SS, 2011 WL 1298152, at *2 (W.D. Tex. Mar. 31, 2011) (concluding that an arrestee could not complain that jail officials took precautions to prevent suicide when he refused to answer booking

questions about his mental state because "jail officials have an affirmative duty to protect [detainees] from harm and would have been derelict in their duties had they not taken proper precautions"). Dickerson does not otherwise show that using the restraint wrap, which was applied with minimal force and resulted in no serious injury, was excessive or clearly unreasonable under the circumstances. *See Callaway v. Travis County*, No. A-15-CA-001-3-SS, 2016 WL 4371943, at *9 (W.D. Tex. July 28, 2016) (concluding that the use of the restraint chair to counteract potentially dilatory tactics by a detainee arrested for driving while intoxicated "was neither excessive nor clearly unreasonable").

In sum, after considering the facts and circumstances, the Court concludes that Dickerson has not overcome the Defendants' entitlement to qualified immunity. Dickerson has not shown that there is a triable issue regarding his claim that excessive force was used during the booking process, in violation of his constitutional rights.

## IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendants' Richard Wheelen and Timothy Bates's Motion for Summary Judgment (Dkt. No. 63) and **DENIES** Plaintiff Rudy Dickerson's Motion for Summary Judgment. (Dkt No. 69).

It is SO ORDERED.

Signed on March 12, 2022.

_____
**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**